SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court. In the interest of brevity, portions of an opinion may not have been summarized.

**State v. L.H. (A-59-17) (079974)**

**Argued March 11, 2019 -- July 22, 2019**

**ALBIN, J., writing for the Court.**

The primary issue in this appeal is whether the interrogation techniques that included false promises of leniency induced defendant L.H. to confess to two alleged sexual assaults and one alleged attempted sexual assault and overbore defendant's will. In this context, the Court must determine whether the State proved beyond a reasonable doubt that, under the totality of the circumstances, defendant's confession was voluntary. The Court also considers whether a remand is necessary because, when M.H., a victim, identified defendant from a photographic lineup, the full dialogue between M.H. and the administering officer in making the identification was not memorialized.

Defendant, who was suspected of committing the alleged offenses, was stopped and brought to the Bloomfield police headquarters on August 6, 2011, at about 2:30 a.m. After being held for three hours, he was brought to an interview room. For the first fifty-five minutes, Detective Lieutenant Joseph Krentz and Detective Thomas Fano secured information from defendant about his education, employment, prior residences, family, and his reason for driving in Bloomfield that evening. Almost an hour into the interrogation, Detective Fano told defendant that he had a "problem." For the next twenty minutes, while defendant deflected questions that would have implicated him in a crime, the two detectives suggested that, if defendant cooperated and incriminated himself, he would receive counseling and help, not go to jail, and remain free to raise his child. Indeed, defendant was told that the truth would set him free. The detectives' assurances and suggestions that defendant would receive help and counseling, stay out of jail, and be there for his daughter if he cooperated were aimed at assuaging the reluctance defendant repeatedly expressed about giving up the right to remain silent.

For example, Detective Krentz stated, "I just need to hear your side of the story so I can find out exactly where you are as far as getting the help you need, the right help." Defendant asked, "The help I need is not sending me to jail is it?" Detective Krentz: "Not at all. Nobody gets rehabilitated in jail." Detective Fano: "Yeah, I agree." The detectives, moreover, continually minimized the nature of the assaults of which defendant was suspected, telling him, "You're not a bad guy," and "You didn't hurt anybody."

1

One hour and fourteen minutes into the interrogation, defendant began to make admissions about his involvement in the charged offenses. The interrogation ended at 8:51 a.m. -- more than three hours after it had begun. In his testimony at the hearing, Detective Krentz conceded that "[e]very time [defendant] expressed hesitancy, [the detectives] talked about the help he was going to get," and that "it was clear . . . that 'help' meant counseling." The trial court rejected defendant's argument that his will was overborne by false promises and declined to suppress his confession.

Defendant also moved for an evidentiary hearing because of the failure of the police to record, electronically or otherwise, the identification procedure that led to M.H. identifying defendant as her assailant. During the fourteen earlier identification procedures, M.H. was unable to make a positive identification of her assailant. On August 8, 2011, two days after defendant's arrest, M.H. viewed a fifteenth photographic array. In the report from that identification, the position of each photograph is given a sequential number from one to six. Next to photo position number three -- designating defendant's photograph -- is the word "SUSPECT." The report does not explain why the word "SUSPECT" was used rather than the six-digit number and letter assigned to every other photograph.

The trial court denied defendant's motion for a hearing, and defendant entered guilty pleas to five counts in the indictment, preserving his right to appeal the denial of both his motion to suppress his confession and his motion for an evidentiary hearing. In an unpublished opinion, the Appellate Division reversed the trial court, vacating defendant's convictions and remanding for further proceedings. The Court granted the State's petition for certification. 233 N.J. 24 (2018).

**HELD:** The State failed to prove beyond a reasonable doubt that, under the totality of the circumstances, defendant's statement was voluntary. Defendant may withdraw his guilty plea. The failure to record the identification procedure as required by Delgado requires a remand to allow defendant the benefit of a hearing to inquire into the reliability of the identification and any other remedy deemed appropriate by the trial court.

1. Due process requires that the State prove beyond a reasonable doubt that a defendant's confession was voluntary and was not made because the defendant's will was overborne. A confession which is the product of physical or psychological coercion must be considered to be involuntary and is inadmissible in evidence regardless of its truth or falsity. The voluntariness determination weighs the coercive psychological pressures brought to bear on an individual to speak against his power to resist confessing. Relevant factors include the suspect's age, education and intelligence, advice concerning constitutional rights, length of detention, whether the questioning was repeated and prolonged in nature, and whether physical punishment and mental exhaustion were involved, as well as previous encounters with law enforcement. The ultimate determination of voluntariness depends on the totality of the circumstances. (pp. 22-26)

2

2.  Because a suspect will have a natural reluctance to furnish details implicating himself, an interrogating officer may attempt to dissipate this reluctance and may even tell some lies during an interrogation.  Certain lies, however, may have the capacity to overbear a suspect's will and to render a confession involuntary.  Thus, a police officer cannot directly or by implication tell a suspect that his statements will not be used against him because to do so is in clear contravention of the Miranda warnings.  Other impermissible lies are false promises of leniency that, under the totality of circumstances, have the capacity to overbear a suspect's will.  A court may conclude that a defendant's confession was involuntary if interrogating officers extended a promise so enticing as to induce that confession.  (pp. 26-30)

3.  The video-recorded interrogation here reveals that the detectives made (1) representations that directly conflicted with the Miranda warnings, (2) promises of leniency by offering counseling as a substitute for jail, and (3) statements that minimized the seriousness of the crimes under investigation -- all relevant factors under the totality-of-the-circumstances test.  In the totality of the circumstances, given the combination of all the relevant evidence and factors, the State failed to show beyond a reasonable doubt that the interrogators' representations to defendant did not overbear his will and induce him to confess.  The detectives secured an involuntary confession.  Because defendant preserved his right to appeal the denial of his motion to suppress the confession, defendant's guilty plea must be vacated.  (pp. 30-39)

4.  In State v. Delgado, the Court required that "law enforcement officers make a written record detailing the out-of-court identification procedure, including the place where the procedure was conducted, the dialogue between the witness and the interlocutor, and the results."  188 N.J. 48, 63 (2006).  The Court instructed that "[w]hen feasible, a verbatim account of any exchange between the law enforcement officer and witness should be reduced to writing," and "[w]hen not feasible, a detailed summary of the identification should be prepared."  Ibid.  Without issuing a mandate, the Court added that "electronic recordation is advisable."  Ibid.  (pp. 39-40)

5.  Here, Detective Michael Ruggiero, who administered the photographic array, did not electronically record the identification procedure or make a "verbatim account" of the words exchanged between him and the witness.  Nor is there any explanation why he did not do so.  The failure to abide by the dictates of Delgado is all the more inexplicable because the identification procedure was prearranged and occurred during normal operating hours at police headquarters, where undoubtedly electronic recording devices were available.  The evidentiary hearing requested by defendant would have provided defendant the opportunity to attempt to secure the information denied to him by the Delgado violation.  Accordingly, the Court remands for an evidentiary hearing to explore the issue of suggestiveness in the identification process and for the determination of an appropriate remedy for the Delgado violation, which may include a jury charge on the State's failure to follow the recordation procedures set forth in Delgado.  (pp. 40-43)

**The judgment of the Appellate Division is affirmed.**

**JUSTICE PATTERSON, concurring in part and dissenting in part,** concurs with the majority and the Appellate Division that the procedure used by police officers in connection with defendant's identification by M.H. did not comport with <u>Delgado</u> and that a remand is needed so that the trial court may decide whether the identification procedure entailed suggestiveness and, if necessary, impose an appropriate remedy. Justice Patterson does not agree, however, that defendant's confession should be suppressed, stressing that the trial court denied defendant's motion to suppress after it reviewed the videotape of defendant's confession and other evidence presented, made detailed factual findings, and concluded that the State had met its burden to prove beyond a reasonable doubt that the confession was voluntary. In Justice Patterson's view, neither the Appellate Division nor the majority afforded the trial court's findings the substantial deference to which they are entitled. Although a portion of the interrogation crossed the line between proper and improper police tactics, Justice Patterson explains, the trial court's finding that defendant's confession was voluntary was supported by sufficient credible evidence in the record, including the videotape.

**JUSTICES LaVECCHIA, FERNANDEZ-VINA, and TIMPONE join in JUSTICE ALBIN's opinion. JUSTICE PATTERSON filed an opinion -- concurring in the remand for an evidentiary hearing as to the identification procedure and dissenting from the suppression of defendant's confession -- in which CHIEF JUSTICE RABNER and JUSTICE SOLOMON join.**

4

SUPREME COURT OF NEW JERSEY
A-59 September Term 2017
079974

State of New Jersey,

Plaintiff-Appellant,

v.

L.H.,

Defendant-Respondent.

On certification to the Superior Court,
Appellate Division.

| Argued | Decided |
|--------|---------|
| March 11, 2019 | July 22, 2019 |

Kayla Elizabeth Rowe, Deputy Attorney General, argued the cause for appellant (Gurbir S. Grewal, Attorney General, attorney; Kayla Elizabeth Rowe, of counsel and on the briefs).

Alicia J. Hubbard, Assistant Deputy Public Defender, argued the cause for respondent (Joseph E. Krakora, Public Defender, attorney; Alicia J. Hubbard, of counsel and on the briefs).

Farbod K. Faraji argued the cause for amicus curiae American Civil Liberties Union of New Jersey (Gibbons, and American Civil Liberties Union of New Jersey Foundation, attorneys; Farbod K. Faraji, Lawrence S. Lustberg, and Alexander Shalom, on the brief).

Richard P. Lomurro argued the cause for amicus curiae Association of Criminal Defense Lawyers of New Jersey

1

(Lomurro, Munson, Comer, Brown & Schottland, attorneys; Richard P. Lomurro, of counsel and Christina Vassiliou Harvey, of counsel and on the brief).

JUSTICE ALBIN delivered the opinion of the Court.

No piece of evidence may have greater sway over a jury than a defendant's confession. For that reason, it is of critical importance that law enforcement officers use interrogation techniques that will elicit confessions by lawful means.

To ensure that law enforcement officers turn square corners, New Jersey's jurisprudence requires that the State "prove the voluntariness of a confession beyond a reasonable doubt." State v. Galloway, 133 N.J. 631, 654 (1993). In their gatekeeping roles, our courts are charged with admitting into evidence only lawfully secured confessions. False promises of leniency -- promises "so enticing" that they induce a suspect to confess -- have the capacity to overbear a suspect's will and to render the confession involuntary and inadmissible. See State v. Hreha, 217 N.J. 368, 383 (2014).

The primary issue in this appeal is whether the interrogation techniques that induced defendant L.H. to confess crossed the forbidden line drawn by our case law.

2

In this case, the police took defendant into custody on suspicion that he had sexually assaulted two women and attempted to sexually assault another woman. During an interrogation that lasted approximately three hours, the two interrogating detectives repeatedly promised defendant counseling, indicating that he would not go to jail if he cooperated. The detectives also told defendant that "the truth would set him free" -- advice seemingly at odds with the Miranda[1] warning given to defendant that anything he said could be used against him. More than an hour into the interrogation, defendant made incriminating statements that implicated him in all three crimes. He was arrested and criminally charged.

Two days later, one of the victims, while viewing a photographic lineup, identified defendant as her assailant. The officer conducting the identification did not record the full dialogue between him and the victim, or the degree of confidence expressed by the victim in making the identification. Defendant claimed that the failure to memorialize the identification procedure violated State v. Delgado, 188 N.J. 48 (2006).

In pretrial hearings, the trial court determined that defendant's confession and the victim's identification were admissible. The court determined that the interrogating detectives did not overbear defendant's will

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

3

and that defendant made a voluntary confession. The court also determined that defendant failed to show that the identification procedure was suggestive, entitling him to a Wade[2] hearing, or that the recordation of that procedure violated the law. After the pretrial hearings, defendant pled guilty to various offenses but preserved his right to appeal the trial court's evidentiary decisions.

The Appellate Division reversed. It held that the State failed to prove the voluntariness of the confession, finding that the detectives made false promises that overbore defendant's will. It also remanded to the trial court for an evidentiary hearing to decide whether the identification procedure complied with Delgado and, if not, to consider the admissibility of the out-of-court identification and an appropriate remedy.

We affirm. We hold that the State failed to prove beyond a reasonable doubt that, under the totality of the circumstances, defendant's statement was voluntary. Based on that standard, the detectives overbore defendant's will by false promises of leniency that assured counseling instead of incarceration, by representations that conflicted with the Miranda warnings, and by minimization of the gravity of the offenses. Defendant therefore may withdraw his guilty plea. Moreover, the failure to record the identification

---

[2] United States v. Wade, 388 U.S. 218 (1967).

4

procedure as required by <u>Delgado</u> requires a remand to allow defendant the benefit of both a <u>Wade</u> hearing to inquire into the reliability of the identification and any other remedy deemed appropriate by the trial court. We remand for proceedings consistent with this opinion.

## I.

## A.

On May 29, 2012, an Essex County grand jury returned a twelve-count indictment, charging defendant with first-degree kidnapping of M.H. and A.D., N.J.S.A. 2C:13-1(b)(1) (two counts); first-degree aggravated sexual assault of M.H. and A.D., N.J.S.A. 2C:14-2(a)(3) (four counts); second-degree aggravated assault of M.H. and A.D., N.J.S.A. 2C:12-1(b)(1) (three counts); first-degree attempted aggravated sexual assault of V.B., N.J.S.A. 2C:5-1 and N.J.S.A. 2C:14-2(a)(3) (one count); and third-degree terroristic threats to M.H. and A.D., N.J.S.A. 2C:12-3(a) (two counts). The indictment alleged that defendant sexually assaulted M.H. on June 18, 2011 and A.D. on July 23, 2011 in Bloomfield Township and attempted to sexually assault V.B. on August 4, 2011 in Belleville Township.

Defendant moved to suppress the confession he made during an interrogation conducted by Detective Lieutenant Joseph Krentz and Detective Thomas Fano of the Bloomfield Police Department. Defendant argued that the

detectives induced his confession by making false promises that he would not face jail time, thus overbearing his will and rendering his confession involuntary.

The trial court held a two-day Miranda hearing to determine the admissibility of the confession. During the State's presentation, Detective Krentz testified and the video-recorded interrogation was admitted into evidence. We discern the following facts from that record.

On August 6, 2011, at about 2:30 a.m., a task force of law enforcement officers from the Bloomfield and Belleville police departments and the Essex County Prosecutor's Office, investigating the recent sexual assaults of women, stopped a motor vehicle in Bloomfield driven by defendant, who was suspected of committing the offenses. Detective Krentz directed a patrol officer to transport defendant to Bloomfield police headquarters.

For approximately three hours at headquarters, defendant remained either handcuffed in a room or confined in a cell. Then, at 5:31 a.m., Detectives Krentz and Fano led defendant into an interview room, where the detectives sat on the opposite side of a desk from defendant.

Detective Fano read defendant the Miranda warnings, advising him that he had a right to remain silent and to have an attorney present, and that anything he said could "be used against [him] in [a] court of law." Defendant

6

signed the waiver-of-rights form. When defendant asked why he was being detained, Detective Fano responded that they would "get to that" after they asked "a couple of basic questions," adding, "you are here for a reason. . . . We didn't pick you out of the tree."

For the first fifty-five minutes, the detectives secured information from defendant about his education, employment, prior residences, family, and his reason for driving in Bloomfield that evening. They learned that defendant was a high school graduate with several years of college credits and that he had a young daughter with a former girlfriend. They also learned that defendant had been convicted of a sexually related offense as a result of a claimed consensual relationship with a sixteen-year-old female when he was twenty-one or twenty-two years old and that he was a registered sex offender.

The detectives at first made no headway with defendant when inquiring about his movements in Bloomfield several evenings earlier. The interrogation began in earnest when defendant denied having any familiarity with Franklin Street -- the site of two sexual assaults against M.H. and A.D.

Almost an hour into the interrogation, Detective Fano announced that they had been watching him, and did not "want to pussyfoot with [him]." The detective reminded defendant that, when arrested, he was wearing gloves, his pants were open, and condoms were found in his car. Detective Fano then told

defendant that he had a "problem."  For the next twenty minutes, while defendant deflected questions that would have implicated him in a crime, the two detectives suggested that, if defendant cooperated and incriminated himself, he would receive counseling and help, not go to jail, and remain free to raise his child.  Indeed, defendant was told that the truth would set him free.

The promises of "help" and "counseling" became a consistent theme of the interrogation:

> [Detective Krentz]:  We want to get you the help that you need.
>
> [Detective Fano]:  You need some help, dude.  You got a problem.
>
> [Detective Krentz]:  We want to make sure you get the right help.
>
> [Detective Fano]:  We're here to help you.

The detectives stayed on theme, repeatedly telling defendant that they would get him the help he needed for his problem if he cooperated.  A few examples will suffice:  "I want to get you the help that you need"; "I know with the right help . . . you'll be fine down the road"; "we're also trying to help you rebuild for the future."

The detectives made clear that defendant had to be honest to receive counseling and help -- and to remain free to raise his child:

[Detective Fano]: [W]e're gonna help you out. You need some counseling. You need some more counseling.

[Detective Krentz]: And we're willing to get you the help that you need.

. . . .

[Detective Krentz]: So we're willing to get you the help that you need but you gotta be honest.

[Detective Fano]: You gotta be honest.

[Detective Krentz]: You gotta be honest.

. . . .

[Detective Fano]: Think about your daughter. <u>I want you to be there to raise her</u>. . . . 'Cause women need guidance from a guy.

. . . .

[Detective Fano]: <u>[The truth is] going to set you free. The truth -- and it is a true saying, the truth will set you free.</u>

[(emphases added).]

Detective Krentz allayed concerns raised by defendant about whether his cooperation would lead to his immediate incarceration because, as defendant told the detectives, in his last experience with the criminal justice system, after he told "the truth" to the police during an interrogation, he was put in jail:

[Defendant]: [I] told them the truth and I told them exactly what -- what happened, it happened that quick.

9

[Detective Fano]: Well, that's not gonna happen -- it's not gonna go down like that. It's not gonna --

[Detective Krentz]: Look at me. Look at me. . . . If I'm gonna lock you up, I'm gonna tell you I'm gonna lock you up. I'm not gonna bullshit you.

The detectives reassured defendant he was not facing jail:

[Defendant]: Am I going to jail tonight? Is this going to be my last meal or something like that?

[Detective Krentz]: No, no, not at all.

[Defendant]: That's what everybody says and then --

[Detective Krentz]: That's TV bullshit, dude. That's TV.

The detectives' assurances and suggestions that defendant would receive help and counseling, stay out of jail, and be there for his daughter if he cooperated were aimed at assuaging the reluctance defendant repeatedly expressed about giving up the right to remain silent:

[Defendant]: I'm not trying to dig myself in a hole.

. . . .

[Defendant]: I just don't want to jeopardize all the stuff that I've been trying to rebuild --

[Detective Fano]: We understand. Rebuild. . . . We want you to get more counseling so you can continue.

. . . .

10

[Defendant]: What I'm trying to say is that I can't afford to stop my -- my working -- I can't afford to stop seeing my daughter.

[Detective Fano]: Your life. I understand that.

[Defendant]: Or being in . . . .

[Detective Fano]: Right. That's why we're trying to talk to you. That's why we're trying to talk to you because of your daughter.

. . . .

[Defendant]: I just feel like I'm shooting myself in the foot right now. I feel like -- I --

[Detective Krentz]: Do you want help?

. . . .

[Detective Krentz]: I just need to hear your side of the story so I can find out exactly where you are as far as getting the help you need, the right help.

[Defendant]: The help I need is not sending me to jail is it?

[Detective Krentz]: Not at all. Nobody gets rehabilitated in jail.

[Detective Fano]: Yeah, I agree.

[Detective Krentz]: Nobody gets rehabilitated in --

[Detective Fano]: Dude, you got a little -- you got a baby daughter, you want to be around.

11

The detectives, moreover, continually minimized the nature of the sexual assaults defendant was suspected of committing:

> [Detective Krentz]: [Y]ou're not a bad guy.
>
> . . . .
>
> [Detective Krentz]: You didn't hurt anybody -- look at me, you didn't hurt anybody.
>
> [Detective Fano]: Okay. You didn't hurt anybody.
>
> [Detective Krentz]: I know you're not a bad guy. You didn't hurt anybody.
>
> . . . .
>
> [Detective Fano]: I know you're not a bad person . . . . You don't hurt them.
>
> . . . .
>
> [Detective Krentz]: [Y]ou didn't rob them. . . . You didn't beat them up. You treated them with respect, you treated them okay.

One hour and fourteen minutes into the interrogation, defendant began to make admissions about his involvement in the sexual assaults of M.H. and A.D. and the attempted sexual assault of V.B. The interrogation ended at 8:51 a.m. -- more than three hours after it had begun.

In his testimony at the <u>Miranda</u> hearing, Detective Krentz conceded that "[e]very time [defendant] expressed hesitancy, [the detectives] talked about the

12

help he was going to get," and that "it was clear . . . that 'help' meant counseling."

B.

The trial court rejected defendant's argument that his will was overborne by false promises that, if he cooperated, he would not go to jail and instead receive help in the form of counseling.  The court determined that "it is clear from the totality of the circumstances that the defendant's confession was knowing, voluntary and not the product of improper police procedure and/or misconduct."  The court observed that the "good guy approach" is a permissible interrogation technique and that an interrogator's "sympathetic attitude . . . is not in and of itself enough to render a confession involuntary."  The court found that defendant's "retelling of his version of the attacks," including minimizing his role, clearly shows that he was not "compelled to provide information . . . based upon the promises made by the detectives of help not jail."  The voluntariness of defendant's confession was supported, in the court's view, by such factors as defendant's age, his college education, his previous conviction of a sex offense, and his prior experience in the criminal justice system in which the incriminating statement he made to the police was

13

what "caused him to end up in jail."[3] The court acknowledged that although "the defendant may have been induced to speak by the detectives' tactics and demeanor, those inducements do not culminate in his will being overborne."

## C.

Defendant also moved for an evidentiary hearing because of the failure of the Bloomfield police to record, electronically or otherwise, the identification procedure that led to M.H. identifying defendant as her assailant. In particular, defendant claimed that the police failed to preserve the dialogue between M.H. and the detective who administered the identification, as required by Delgado, 188 N.J. at 63, thereby depriving him of evidence concerning the reliability of the identification.

The limited record before us is based on four-page information packets generated by the Bloomfield Police Department detailing each of the fifteen photographic arrays shown to M.H. between June 21 and August 8, 2011.[4]

---

[3] At the time he was interrogated, defendant was twenty-six years old and held an Associate's Degree from a local community college. Defendant also had a criminal history. Specifically, after making an incriminating statement during an interrogation, he had pled guilty to second-degree endangering the welfare of a child. As a result of that offense, defendant was sentenced to time served and required to register under Megan's Law, N.J.S.A. 2C:7-1 to -23.

[4] Apparently, these information packets were not placed in evidence at the time defendant requested the Delgado hearing or made part of the record before the Appellate Division.

14

Each four-page information packet consists of (1) a copy of the pre-printed photo display instructions read by M.H. or to M.H. by the officer administering the identification; (2) the photo display report listing the number and letter code attached to each photograph and providing space for the officer to write comments about the witness's demeanor; (3) a copy of the six photographs shown to M.H. on each occasion; and (4) the identification report, partially pre-printed, that records whether M.H. made an identification and that allows a handwritten narrative of the identification.

During the fourteen identification procedures conducted between June 21 and August 4, 2011, M.H. was unable to make a positive identification of her assailant. On August 8, 2011, two days after defendant's arrest, M.H. viewed a fifteenth photographic array administered by Detective Michael Ruggiero. According to the State, Detective Ruggiero was a "blind administrator," meaning that he did not know which of the six photographs displayed to M.H. depicted the true suspect. The photographs were of six black men with close-cropped hair.

The photo display report indicates that the identification procedure began at 9:24 a.m. and ended at 9:33 a.m. with M.H. identifying defendant's photograph. In the report, the position of each photograph is given a sequential number from one to six. Next to photo position numbers one, two,

four, five, and six is a six-digit number followed by a letter.  Next to photo position number three -- designating defendant's photograph -- is the word "SUSPECT."  The report signed by Detective Ruggiero does not explain why the word "SUSPECT" was used rather than the six-digit number and letter assigned to every other photograph.  Under the category "Comments and Demeanor of Witness," Detective Ruggiero wrote, "Calm, focused."  Next to the line, "Did witness ask to see any photos again," he circled the word "no."

The identification report, signed by both M.H. and Detective Ruggiero, indicates that six photographs "were displayed one at a time and were never shown next to one another."  The following pre-printed words (not emphasized) and handwritten words (underscored) appear in the report:  "I examined the photographs carefully until I identified photograph # 3 As being that of the guy who grabbed me and raped me behind the abandoned house on Franklin St. in June."  Nothing more appears in the commentary portion of the report other than the pre-printed words that Detective Ruggiero did not make any threats or promises or urge or prompt M.H. to choose a photograph.

Nowhere in the four-page information packet for the August 8 photographic array is there any recordation of any dialogue between M.H. and Detective Ruggiero before, during, or after the identification; M.H.'s level of confidence when making the identification; or any possible positive or

16

negative gestures of M.H., such as spontaneous affirmation or hesitation in identifying defendant's photograph.

The trial court denied defendant's motion for a hearing without responding to defendant's argument that the failure to adequately record the identification procedure violated <u>Delgado</u>. Instead, the court observed that the 2001 New Jersey Attorney General Guidelines did not require the police to electronically record photographic arrays, and cited <u>Delgado</u> for that proposition. The court concluded that the identification process was "completed within the Attorney General Guidelines as they existed at the time" of the procedure. The court then found that defendant "failed to show any evidence of suggestiveness [in the identification process] that could lead to a misidentification." In the absence of such evidence, the court reasoned that defendant was not entitled to a <u>Wade</u> hearing to determine the reliability of the identification.

## D.

In accordance with a plea agreement, defendant entered guilty pleas to five counts in the indictment: first-degree kidnapping of M.H. and A.D.; first-degree aggravated sexual assault of M.H. and A.D.; and first-degree attempted aggravated sexual assault of V.B. The court sentenced defendant on one kidnapping count to a twenty-year state-prison term subject to the No Early

17

Release Act, N.J.S.A. 2C:43-7.2, and to concurrent twenty-year terms subject to the No Early Release Act on each of the four remaining counts. In all, defendant received an aggregate twenty-year prison sentence subject to an eighty-five percent parole disqualifier. The remaining charges in the indictment were dismissed. Defendant preserved his right to appeal the denial of both his motion to suppress his confession and his motion for an evidentiary hearing to determine the reliability of the identification.

E.

In an unpublished opinion, the Appellate Division reversed the trial court, vacating defendant's convictions and remanding for further proceedings. First, the Appellate Division held that the State failed to prove beyond a reasonable doubt that defendant gave a "voluntary" confession to the detectives. It determined that the trial court's "detailed analysis" had "overlooked that the officers' false promises of no incarceration directly negated the Miranda warnings and induced defendant to confess." It acknowledged that the detectives' offer of "counseling alone did not render defendant's confession involuntary under the totality of the circumstances." The Appellate Division, however, stressed that "[o]n three separate occasions and in three different ways, the officers assured defendant that if he spoke with them, he would not be put in jail." It maintained that the detectives'

18

suggestion that "a confession would only help him to obtain counseling, and would not result in his incarceration," contravened the <u>Miranda</u> warnings. It also rejected the argument that defendant knew from his prior experience with the police that any statement he made would be used against him because the detectives in this case "told defendant to disregard his prior encounter with law enforcement." Because the false promises of no incarceration induced defendant to speak in violation of <u>Miranda</u>, the Appellate Division suppressed defendant's confession.

Second, the Appellate Division held that the trial court should have conducted a hearing to determine whether the Bloomfield police failed to record the photo-identification procedure in accordance with <u>Delgado</u>.[5] It reasoned that the <u>Delgado</u> requirements were intended to expose any suggestiveness in the identification procedure, and therefore defendant should not be deprived of a <u>Wade</u> hearing because law enforcement failed to abide by the dictates of <u>Delgado</u>. It ordered the trial court on remand to "conduct such hearings it deems necessary to determine the admissibility of the out-of-court identification" and added that if the identification procedures were not

---

[5] The Appellate Division noted that the packets documenting the identification procedures were not marked in evidence or made part of the record before it. Those packets, however, are part of the record before this Court.

19

properly recorded, "Delgado does not necessarily require the court to suppress the identification."

## F.

This Court granted the State's petition for certification.[6] 233 N.J. 24 (2018). This Court also granted the motions of the American Civil Liberties Union of New Jersey (ACLU) and the Association of Criminal Defense Lawyers of New Jersey (ACDL) to participate as amici curiae.

## II.

## A.

The State urges that we affirm the trial court's factfindings that defendant's confession was voluntary and not the product of improper psychological compulsion. The State maintains that "the interrogation techniques used by the detectives did not strip defendant of his capacity for self-determination." In particular, the State rejects the assertion that the detectives made "explicit" promises that defendant could avoid jail if he confessed. Rather, it claims that "the detectives implicitly promised that if defendant confessed, they could connect him with effective counseling." In its view, "[d]efendant's statements, questions, requests, and negotiations . . .

---

[6] Before granting certification, we granted the State's motion to expand the record to include defendant's video-recorded statement.

20

demonstrate that his will was not overborne at any point during the interrogation."

The State also submits that the trial court did not err in denying defendant's request for an evidentiary hearing to determine the reliability of the identification. The State argues that the recordation of the identification complied with both the Attorney General Guidelines and Delgado and that neither demands a verbatim record -- as opposed to a written summary -- of the identification. It maintains that the Appellate Division took an unprecedented step in holding that Delgado required the trial court to conduct a hearing based on the alleged failure of the police to make a record of the identification procedure.

## B.

Defendant asks that we affirm the Appellate Division's suppression of his confession. He submits that the detectives directly and falsely promised that he would not be jailed if he spoke the truth, contradicting the detectives' earlier assurance "that anything said can and will be used against [you] in court," quoting Miranda v. Arizona, 384 U.S. 436, 469 (1966). Defendant rejects the State's argument that "[he], and others who have been previously prosecuted should know better than to trust police officers" -- that he and others subject to prior interrogations have no excuse "for believing the veracity

21

of police assertions." The false promises, defendant maintains, overbore his will and caused him to make self-incriminating statements.

Defendant also submits that the failure of the police to provide a verbatim account of the identification procedure, as mandated by Delgado, requires a remand for an evidentiary hearing, as ordered by the Appellate Division. In defendant's view, the deficiencies in recording the identification violated not only Delgado, but also the Attorney General's Guidelines.

C.

Amicus ACDL asks this Court to adopt a rule that renders involuntary a confession induced by a combination of false promises that the suspect will receive counseling and avoid jail -- promises that negate the Miranda warning that anything the suspect says can be used against him in court.

Amici ACLU and ACDL both submit that the out-of-court identification procedure did not meet the admissibility requirements set by Delgado and therefore the identification should be suppressed. Suppression is necessary, amici declare, because the detectives have deprived our courts of the record necessary to determine the reliability of the identification.

III.

We first address whether the alleged promises made to defendant by the interrogating detectives -- promises that he would receive counseling and help

and not face jail if he spoke the truth -- violated his rights guaranteed by the United States Constitution and New Jersey law.

The right against self-incrimination is guaranteed by the Fifth Amendment to the United States Constitution and this State's common law, now embodied in statute, N.J.S.A. 2A:84A-19, and evidence rule, N.J.R.E. 503. See U.S. Const. amend. V ("No person . . . shall be compelled in any criminal case to be a witness against himself . . . .");[7] N.J.S.A. 2A:84A-19 ("[E]very natural person has a right to refuse to disclose in an action or to a police officer or other official any matter that will incriminate him or expose him to a penalty or a forfeiture of his estate . . . ."); N.J.R.E. 503 (same as N.J.S.A. 2A:84A-19).

In the landmark case of Miranda v. Arizona, the United States Supreme Court imposed a safeguard to protect a suspect's right against self-incrimination from the psychological pressures inherent in a police-dominated atmosphere that might compel a person "to speak where he would not otherwise do so freely." 384 U.S. at 467. That safeguard mandated that a suspect subject to custodial interrogation "be adequately and effectively apprised of his rights." Ibid. To that end, the Court prescribed a set of

---

[7] The Fifth Amendment right against self-incrimination has been made applicable to the States through the Due Process Clause of the Fourteenth Amendment. Malloy v. Hogan, 378 U.S. 1, 8 (1964).

23

warnings that the police must give a suspect before an interrogation begins --

warnings that, in part, instruct the suspect that "he has the right to remain

silent" and "that anything he says can be used against him in a court of law."

Id. at 479.  Under our state law, at an N.J.R.E. 104(c) hearing,[8] the State bears

the burden of proving beyond a reasonable doubt that a defendant's waiver of

his rights was made knowingly, intelligently, and voluntarily.  State v.

Nyhammer, 197 N.J. 383, 400-01 (2009); State v. Presha, 163 N.J. 304, 313

(2000).[9]

Due process also requires that the State "prove beyond a reasonable

doubt that a defendant's confession was voluntary and was not made because

the defendant's will was overborne."  State v. Knight, 183 N.J. 449, 462

(2005); see also Hreha, 217 N.J. at 383.  "The due process test takes into

consideration 'the totality of all the surrounding circumstances -- both the

characteristics of the accused and the details of the interrogation.'"  Dickerson

v. United States, 530 U.S. 428, 434 (2000) (quoting Schneckloth v.

---

[8]  N.J.R.E. 104(c) provides that "[w]here by virtue of any rule of law a judge is required in a criminal action to make a preliminary determination as to the admissibility of a statement by the defendant, the judge shall hear and determine the question of its admissibility out of the presence of the jury."

[9]  Under federal law, the government must "prove waiver only by a preponderance of the evidence."  See Colorado v. Connelly, 479 U.S. 157, 168 (1986).

24

Bustamonte, 412 U.S. 218, 226 (1973)); see also Hreha, 217 N.J. at 383. The source of this test is the common law, which "recognized that coerced confessions are inherently untrustworthy." Dickerson, 530 U.S. at 433 (citing King v. Warickshall (1783) 168 Eng. Rep. 234, 235 (K.B.) ("[A] confession forced from the mind by the flattery of hope, or by the torture of fear, comes in so questionable a shape . . . that no credit ought to be given to it; and therefore it is rejected.")).

Contemporary constitutional jurisprudence recognizes that

> [t]he abhorrence of society to the use of involuntary confessions does not turn alone on their inherent untrustworthiness. It also turns on the deep-rooted feeling that the police must obey the law while enforcing the law; that in the end life and liberty can be as much endangered from illegal methods used to convict those thought to be criminals as from the actual criminals themselves.
>
> [Spano v. New York, 360 U.S. 315, 320-21 (1959).]

Accordingly, "[a] confession which is the product of physical or psychological coercion must be considered to be involuntary and inadmissible in evidence regardless of its truth or falsity." State v. Miller, 76 N.J. 392, 405 (1978); see also Galloway, 133 N.J. at 654 ("An involuntary confession can result from psychological as well as physical coercion.").

The voluntariness determination weighs the coercive psychological pressures brought to bear on an individual to speak against his power to resist

25

confessing.  Dickerson, 530 U.S. at 434.  Under New Jersey and federal law, the factors relevant to the voluntariness analysis include "the suspect's age, education and intelligence, advice concerning constitutional rights, length of detention, whether the questioning was repeated and prolonged in nature, and whether physical punishment and mental exhaustion were involved," as well as previous encounters with law enforcement.  Hreha, 217 N.J. at 383 (quoting Galloway, 133 N.J. at 654); accord Schneckloth, 412 U.S. at 226.  Those factors are "assessed qualitatively, not quantitatively," for "the presence of even one of those factors may permit the conclusion that a confession was involuntary."  Hreha, 217 N.J. at 384.  The ultimate determination of voluntariness, however, will depend on the totality of the circumstances.  Id. at 383.

Because a suspect will have a "natural reluctance" to furnish details implicating himself in a crime, an interrogating officer may attempt "to dissipate this reluctance and persuade the [suspect] to talk."  Miller, 76 N.J. at 403.  One permissible way is by "[a]ppealing to [the suspect's] sense of decency and urging him to tell the truth for his own sake."  Id. at 405.  Our jurisprudence even gives officers leeway to tell some lies during an interrogation.  See Galloway, 133 N.J. at 655; Miller, 76 N.J. at 403-04.

Certain lies, however, may have the capacity to overbear a suspect's will and to render a confession involuntary. Thus, a police officer cannot directly or by implication tell a suspect that his statements will not be used against him because to do so is in clear contravention of the Miranda warnings. State in Interest of A.S., 203 N.J. 131, 151 (2010) ("A police officer cannot directly contradict, out of one side of his mouth, the Miranda warnings just given out of the other." (quoting State v. Pillar, 359 N.J. Super. 249, 268 (App. Div. 2003))); see also State v. Puryear, 441 N.J. Super. 280, 298 (App. Div. 2015) (finding impermissible an interrogator's representation to the defendant that he "could not hurt himself and could only help himself by providing a statement" because it "contradicted a key Miranda warning"). In A.S., the interrogating officer violated a juvenile defendant's rights by telling her that answering questions "would actually benefit her" -- an assertion at direct odds with the Miranda warning "that anything she said in the interview could be used against her in a court of law." 203 N.J. at 151.

Other impermissible lies are false promises of leniency that, under the totality of circumstances, have the capacity to overbear a suspect's will. See Hreha, 217 N.J. at 383. A "free and voluntary" confession is not one extracted by "threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence." Brady v.

United States, 397 U.S. 742, 753 (1970) (quoting Bram v. United States, 168 U.S. 532, 542-43 (1897)).[10]

"A court may conclude that a defendant's confession was involuntary if interrogating officers extended a promise so enticing as to induce that confession." Hreha, 217 N.J. at 383 (citing State v. Fletcher, 380 N.J. Super. 80, 89 (App. Div. 2005)). "[W]here a promise is likely to 'strip[] defendant of his "capacity for self-determination"' and actually induce the incriminating statement, it is not voluntary." Fletcher, 380 N.J. Super. at 89 (quoting Pillar, 359 N.J. Super. at 272-73).

Under the totality-of-the-circumstances test, a promise of leniency is one factor to be considered in determining voluntariness. Hreha, 217 N.J. at 383. Courts have recognized that the danger posed by promises of leniency is that such promises in some cases may have the capacity to overbear a suspect's will and produce unreliable -- even false -- confessions. See State v. Madsen, 813 N.W.2d 714, 725 (Iowa 2012) ("Courts and commentators have long recognized promises of leniency can induce false confessions leading to wrongful convictions of the innocent.").[11] Some courts also take into account

---

[10] "Bram and its progeny did not hold that the possibly coercive impact of a promise of leniency could not be dissipated by the presence and advice of counsel." Brady, 397 U.S. at 754.

[11] Courts have acknowledged that some promises of leniency -- particularly

an interrogator's "minimization" of the offense when questioning the suspect as one factor in determining the voluntariness of a confession.[12]

State v. Hreha provides general guidance on how to assess a promise of leniency for purposes of determining the voluntariness of a suspect's confession. 217 N.J. at 385-86. There, the defendant testified at a Miranda hearing that, during a custodial interrogation at his workplace, law

those that combine an implied promise of counseling with a reduction or elimination of a custodial sentence -- have the capacity to overbear a suspect's will and cause him to surrender his fundamental right to remain silent. See, e.g., State v. Wiley, 61 A.3d 750, 758, 760 (Me. 2013) (suppressing the defendant's statement because the "overall effect of [the interrogating officer's] representations . . . was to establish that if [the defendant] confessed to the crimes he would get a short county jail sentence with probation"); State v. Reynolds, 145 A.3d 1256, 1258, 1263 (Vt. 2016) (suppressing the defendant's statement because the interrogating officer's remarks "implied that defendant would face treatment or complete absolution" if he adopted the officer's theory of events); see also People v. Wall, 404 P.3d 1209, 1221 (Cal. 2017) ("[W]here a person in authority makes an express or clearly implied promise of leniency or advantage for the accused which is a motivating cause of the decision to confess, the confession is involuntary and inadmissible as a matter of law." (alteration in original) (quoting People v. Boyde, 758 P.2d 25, 39 (Cal. 1988) (en banc)), cert. denied, ___ U.S. ___, 139 S. Ct. 187 (2018).

[12] See, e.g., Commonwealth v. DiGiambattista, 813 N.E.2d 516, 525-28 (Mass. 2004) (suppressing the defendant's statement because the interrogating officer's minimization of the crime and repeated references to the need for "counseling" suggested to the defendant that "counseling" would serve as an alternative to incarceration); see also Saul M. Kassin, The Psychology of Confessions, 4 Ann. Rev. L. & Soc. Sci. 193, 202-03 (2008) ("Research shows that minimization tactics may lead people to infer by pragmatic implication that leniency in sentencing will follow from confession -- even without an explicit promise.").

enforcement officers promised that, if he confessed to committing computer theft, he "could participate in a pretrial intervention (PTI) program instead of facing traditional criminal prosecution" -- a punishment that the officers described as "a slap on the wrist." Id. at 375-77. The defendant also testified that the officers promised him that he could "exit the building without handcuffs and suggested that he would not lose his job." Id. at 376. During the Miranda hearing, the testifying officer did not deny making those promises but "merely asserted that he could not recollect whether any promises had been made." Id. at 384.

Because the trial court misconstrued the testimony at the Miranda hearing, we overturned the court's finding of voluntariness and remanded for a new hearing. Id. at 385. On remand, we directed the court to make fresh credibility and factual findings and to determine whether the officers extended any promises of leniency and, if so, whether those promises were likely to induce an involuntary confession in light of the totality of the circumstances. Id. at 385-86.

We now apply the principles relevant to determining voluntariness to the facts of this case.

IV.

We begin with our standard of review. "When faced with a trial court's admission of police-obtained statements, an appellate court should engage in a 'searching and critical' review of the record to ensure protection of a defendant's constitutional rights." Hreha, 217 N.J. at 381-82 (quoting State v. Pickles, 46 N.J. 542, 577 (1966)). Subject to that caveat, this Court generally will defer to a trial court's factual findings concerning the voluntariness of a confession that are based on sufficient credible evidence in the record. See State v. Elders, 192 N.J. 224, 244 (2007). Factual findings, however, that are clearly mistaken are accorded no deference. State v. S.S., 229 N.J. 360, 381 (2017). When factfindings are clearly mistaken, "the interests of justice demand intervention" by an appellate court. Ibid. Simply put, "[d]eference ends when a trial court's factual findings are not supported by sufficient credible evidence in the record." Ibid. Issues of law are reviewed de novo. Hreha, 217 N.J. at 382.

The video-recorded interrogation here reveals that the detectives made (1) representations that directly conflicted with the Miranda warnings, (2) promises of leniency by offering counseling as a substitute for jail, and (3) statements that minimized the seriousness of the crimes under investigation -- all relevant factors under the totality-of-the-circumstances test.

First, the detectives advised defendant that telling the truth would be helpful to him and "w[ould] set [him] free." That advice directly conflicted with the <u>Miranda</u> warning that anything defendant said could be used <u>against</u> him. Interrogating officers are not allowed to disarm the <u>Miranda</u> warnings during the interrogation by falsely asserting or suggesting that a suspect's words will be used in his favor and not against him in court. <u>See</u> <u>A.S.</u>, 203 N.J. at 151. Although defendant had experience in the criminal justice system, which ordinarily would suggest he was on notice that his words would be used against him, the detectives suggested that he should disregard his prior experience and tell the truth, in which case he would not go to jail as happened the last time.

Second, the detectives repeatedly told defendant that they would get him help in the form of counseling and coupled those representations with the assurance that if he told the truth he would not go to jail. Here are but a few examples:

> [Detective Fano]: [W]e're gonna help you out. You need some counseling. You need some more counseling.
>
> [Detective Krentz]: And we're willing to get you the help that you need.
>
> . . . .

32

[Defendant]: Am I going to jail tonight? Is this going to be my last meal or something like that?

[Detective Krentz]: No, no, not at all.

. . . .

[Defendant]: The help I need is not sending me to jail is it?

[Detective Krentz]: Not at all. Nobody gets rehabilitated in jail.

[Detective Fano]: Yeah, I agree.

The detectives also reinforced the notion that a jail term would be incompatible with the needs of his daughter, who required a father in her life.

Third, the detectives repeatedly minimized the nature and gravity of the of defendant's alleged offenses -- intimating that his conduct was amenable to counseling and rehabilitation. The detectives told defendant that he "didn't hurt anybody" or "rob them"; that he "didn't beat them up" and "treated them with respect"; and that he was "not a bad guy," was "salvageable," and could "rebuild." One of the detectives even suggested that he wanted to get defendant the same type of counseling his family had secured for his own nephew.

The psychologically coercive techniques illustrated above were not referred to by the trial court, which described the detectives as lending a sympathetic ear and employing the "good guy approach," but making no

promises.  But the record revealed much more.  The trial court did not canvass the law that identifies psychological interrogation techniques, which, in the aggregate, have the capacity to overbear a suspect's will.[13]  We agree with the Appellate Division that the trial court "overlooked that the officers' false promise of no incarceration directly negated the Miranda warnings and induced defendant to confess."  The Appellate Division conducted a "'searching and critical' review of the record" in reversing the trial court.  See Hreha, 217 N.J. at 381-82 (quoting Pickles, 46 N.J. at 577).  Such a review leads us as well to the conclusion that the trial court was "clearly mistaken" in finding that defendant's confession was voluntary beyond a reasonable doubt. See S.S., 229 N.J. at 381.

In determining whether the State satisfied its burden of proving beyond a reasonable doubt the voluntariness of defendant's confession, we do not look at any one factor in isolation -- such as the statement that contradicted the Miranda warning, the promises of help and counseling coupled with the implicit assurance he would not face jail, and the minimization of his conduct

---

[13]  The dissent emphasizes the trial court's finding that, as defendant confessed, "he -- not his interrogators -- controlled the flow of information in their exchange."  Post at ___ (slip op. at 12-13).  However, a defendant's incriminating remarks after his will is overborne are not relevant to whether his will was overborne.  Statements made by defendant after the violation of his Fifth Amendment rights cannot repair the constitutional violation.

34

in the offenses he committed. Rather we view all as part of a larger tableau that constitutes the totality of the circumstances. See Hreha, 217 N.J. at 383-84. Viewed in this light, the State failed to meet its burden that defendant's confession was voluntarily secured beyond a reasonable doubt by means consistent with our constitutional jurisprudence.

The facts before us are unlike those in State v. Miller, a case in which a sharply divided Court -- with three members dissenting -- found a confession voluntary, while acknowledging that the interrogation technique pressed the limits of how to secure a voluntary confession by lawful means. 76 N.J. at 404-05, 408. In that case, Miller became the focus of an investigation into the brutal murder of a seventeen-year-old female. Id. at 396-97. Two state troopers transported Miller from the factory where he worked to a state police barracks, where he arrived at 11:49 p.m. Id. at 397. The tape-recorded interrogation began about two hours later and lasted fifty-eight minutes. Ibid. Miller was read and waived his Miranda rights. Ibid. The interrogating officer advised Miller he was a suspect in the murder and a back-and-forth conversation proceeded, with Miller at first denying his involvement in the crime. Ibid. At some point, Miller stated that "whoever did it really needs help." Id. at 398. In response, "[t]he officer suggested that such a person was not really a criminal who should be punished, but rather needed medical

35

treatment" and that "he would do all he could to help [Miller] but that [Miller] had to help himself first by talking about it." Ibid.

Miller then gave an incredible account of how he was walking with the young woman through a field when a knife-wielding man attacked her, of how he attempted to defend her, and of how he panicked and took her dead body and dropped it off a bridge into a stream. Id. at 398. Confronted with this account, the officer said, "[Y]ou killed this girl didn't you?" Ibid. In the face of Miller's continued denial, the officer stated, "You've got to tell me the truth. I can't help you without the truth." Ibid. The officer persisted that Miller had to be "truthful with [himself]." Id. at 399. Shortly afterwards, Miller confessed. Ibid.

The Court formulated the voluntariness issue by posing two questions: (1) can an interrogating officer "appeal to a suspect by telling him that he is the suspect's friend and wants to help him [and] that whoever killed this girl is not a criminal who should be punished, but a person who needs medical treatment"; and (2) "[d]oes the officer have the right to tell the suspect that he must help himself first by telling the truth and then the officer will do what he can to help the suspect with his problem?" Id. at 403-04. Having formulated the issue, the Court conceded that the interrogation technique used "moves into

a shadowy area and if carried to excess in time and persistence, can cross that intangible line and become improper." Id. at 404.

Significantly, when the United States Court of Appeals for the Third Circuit denied Miller's habeas corpus petition challenging the voluntariness of the confession, the divided three-judge panel observed that, based on the interrogation techniques, "if Miller had made remarks that indicated that he truly believed that the state would treat him leniently because he was 'not responsible' for what he had done or that he believed that he would receive psychiatric help rather than punishment, we might not find the confession voluntary." Miller v. Fenton (Fenton), 796 F.2d 598, 601, 613 (3d Cir. 1986). By the reckoning of the majorities in both Miller and Fenton, the investigating officer's interrogation techniques evidently approached the outer limit of how lawfully to secure a voluntary confession.[14]

---

[14] The dissents in Miller and Fenton strongly condemned the interrogation techniques used by the investigating officer and protested that fundamental rights must be honored in cases involving even egregious crimes. Miller, 76 N.J. at 409, 423 (Conford, P.J.A.D., dissenting); Fenton, 796 F.2d at 627-28 (Gibbons, J., dissenting). In his dissent in Miller, Judge Conford lamented that "this case signals to the law-enforcement community that the method of interrogation of this defendant resulting in the confession before us is unexceptionable and may be freely practiced." Miller, 76 N.J. at 410 (Conford, P.J.A.D., dissenting). Similarly, in his dissent in Fenton, Judge Gibbons criticized the majority for "endorsing a thoroughly bad piece of police work" and thus sending "a signal to the police community in this circuit that is likely to have the harmful consequence of encouraging coercion of defendants

The interrogation techniques used in the present case -- in their totality -- go well beyond the norms haltingly approved in Miller. The interrogation here "carried to excess in time and persistence" and "cross[ed] that intangible line and bec[a]me improper." See Miller, 76 N.J. at 404.[15]

The defendant in this case was arrested at 2:30 a.m., transported to headquarters, and remained handcuffed in a room or confined in a cell for the next three hours. Not until 5:31 a.m. did the three-hour interrogation begin. Although at one point defendant indicated that he was "tired as hell," the record does not reveal how long defendant had gone without sleep because the detectives did not ask during the interrogation. During the interrogation, to overcome defendant's reluctance to speak, the detectives employed the techniques that we have already discussed at length. The detectives

_____

in place of acceptable methods of investigation." Fenton, 796 F.2d at 613-14 (Gibbons, J., dissenting).

[15] The present case is not similar to Galloway either -- a murder case in which the defendant was interrogated for harshly shaking a three-month-old child, eventually causing the child's death. 133 N.J. at 637-39. After repeatedly warning the defendant of his Miranda rights, the interrogating officer "used the 'theme' that defendant had to tell him what had happened to the child so the doctors could properly treat the child." Id. at 639. The defendant then "gave an incriminating oral account of the events surrounding the shaking of the child." Ibid. The officer admitted that he intended to use the information as part of his criminal investigation. Id. at 653. Relying on Miller, the Court found that this deceptive interrogation technique did not render the confession involuntary. Id. at 655-57.

38

undermined the <u>Miranda</u> warning that defendant's words could be used <u>against</u> him by telling him the truth would set him free; they falsely promised help and counseling as a substitute for jail; and they minimized the seriousness of the offenses under investigation. In the totality of the circumstances, given the combination of all the relevant evidence and factors, the State failed to show beyond a reasonable doubt that the interrogators' representations to defendant did not overbear his will and induce him to confess.

Therefore, like the Appellate Division, we conclude that the detectives secured an involuntary confession. Because defendant preserved his right to appeal the denial of his motion to suppress the confession, defendant's guilty plea must be vacated.

V.

We next address defendant's claim that the Bloomfield police failed to properly record the photographic-array procedure leading to M.H.'s identification of defendant, thus entitling him to an evidentiary hearing. The governing law at the time of the out-of-court identification was <u>State v. Delgado</u>, 188 N.J. 48 (2006).[16]

---

[16] The photographic array was administered several weeks before our decision in <u>State v. Henderson</u>, 208 N.J. 208 (2011), and nearly a year before we promulgated <u>Rule</u> 3:11. <u>See</u> <u>Henderson</u>, 208 N.J. at 208, 220 (announcing on August 24, 2011 that "[t]he revised principles in this decision will apply purely prospectively"). The parties agree that this appeal is controlled by <u>Delgado</u>.

39

In Delgado, we exercised our supervisory powers under Article VI, Section 2, Paragraph 3 of the New Jersey Constitution and required that "law enforcement officers make a written record detailing the out-of-court identification procedure, including the place where the procedure was conducted, the dialogue between the witness and the interlocutor, and the results." 188 N.J. at 63. We emphasized that "the dialogue between a law enforcement officer and a witness may be critical to understanding the level of confidence or uncertainty expressed in the making of an identification and whether any suggestiveness, even unconsciously, seeped into the identification process." Id. at 60. "Preserving the words exchanged between the witness and the officer conducting the identification procedure," we recognized, "may be as important as preserving either a picture of a live lineup or a photographic array." Id. at 63.

We instructed that "[w]hen feasible, a verbatim account of any exchange between the law enforcement officer and witness should be reduced to writing," and "[w]hen not feasible, a detailed summary of the identification should be prepared." Ibid. Without issuing a mandate, we added that "[i]n the station house where tape recorders may be available, electronic recordation is advisable." Ibid. Here, Detective Ruggiero, who administered the photographic array, did not electronically record the identification procedure

40

or make a "verbatim account" of the words exchanged between him and the witness. Nor do we have any explanation why he did not do so.

Detective Ruggiero used the pre-printed forms supplied by the Bloomfield police that provided certain scripted remarks to be read to or by the witness and blank spaces for the inclusion of handwritten observations by the detective and explanations by the witness. The police documented the photographic array shown to M.H. and the photograph she selected. Detective Ruggiero handwrote "[c]alm, focused" in the category for comments and demeanor of witness. After the pre-printed words, "I examined the photographs carefully until I identified photograph #," either Detective Ruggiero or M.H. wrote the number "3" signifying the photograph selected and added that he was the "guy" who "grabbed me and raped me behind the Abandoned house on Franklin St. in June." The four-page identification procedure packet does not contain the required verbatim account or a detailed summary of the dialogue between Detective Ruggiero and M.H.

The failure to abide by the dictates of Delgado is all the more inexplicable because the identification procedure was prearranged and occurred during normal operating hours at police headquarters, where

41

undoubtedly electronic recording devices were available.[17]  The evidentiary

hearing requested by defendant would have provided defendant the opportunity

to attempt to secure the information denied to him by the Delgado violation --

the full dialogue between Detective Ruggiero and M.H. before, during, and

immediately after the identification; M.H.'s statement of confidence in her

identification; and evidence of any potential suggestiveness in the

identification procedure.  For example, without knowing how and when the

word "SUSPECT" was placed next to defendant's photograph on the photo

display report -- rather than the six-digit number and letter assigned to the five

other photos in the array -- doubt is raised about whether Detective Ruggiero

was a "blind administrator."

Accordingly, we remand for an evidentiary hearing to explore the issue

of suggestiveness in the identification process and for the determination of an

appropriate remedy for the Delgado violation.  We do not suggest that the

court is required to bar the identification.  See State v. Anthony, 237 N.J. 213,

239 (2019) ("We have not, however, created bright-line rules that call for the

'suppression of reliable evidence any time a law enforcement officer makes a

mistake.'"  (quoting Henderson, 208 N.J. at 303)).  The trial court may

---

[17]  Indeed, the Bloomfield police had video-recorded defendant's interrogation
just two days earlier.

consider charging the jury on the State's failure to follow the recordation procedures set forth in <u>Delgado</u>. <u>See</u> <u>id.</u> at 234-35.

If such a charge is appropriate,

> jurors should be told that officers are required to record identification procedures . . . ; if that is not feasible, they are required to prepare a contemporaneous, verbatim written account of the procedure. If the police did not follow that practice, and, for example, did not capture the dialogue between the witness and the officer, . . . the jury may take that into account when it evaluates the identification evidence.[18]

> [<u>Id.</u> at 235.]

VI.

For the reasons expressed, we affirm the judgment of the Appellate Division, which determined that the trial court erred in finding defendant's confession voluntary. We hold that the State failed to prove beyond a reasonable doubt that defendant rendered a voluntary confession, and therefore the confession must be suppressed. Accordingly, defendant is entitled to withdraw his guilty plea, having preserved that issue for appeal.

We also hold that the police failed to prepare a contemporaneous verbatim account of the identification procedure as required by <u>Delgado</u>. An

---

[18] The proposed jury charge is appropriate because this case arose after <u>Delgado</u> but before <u>Henderson</u> and the adoption of <u>Rule</u> 3:11. <u>Supra</u> note 16. Today, the police must also record "a witness' statement of confidence, in the witness' own words." <u>R.</u> 3:11(c)(7); <u>see also</u> <u>Anthony</u>, 237 N.J. at 235.

43

evidentiary hearing must be conducted prior to trial to determine whether any

suggestiveness occurred during the identification procedure, and the court also

must determine any appropriate remedy for the Delgado violation.  We remand

for proceedings consistent with this opinion.


JUSTICES LaVECCHIA, FERNANDEZ-VINA, and TIMPONE join in JUSTICE ALBIN's opinion.  JUSTICE PATTERSON filed an opinion -- concurring in the remand for an evidentiary hearing as to the identification procedure and dissenting from the suppression of defendant's confession -- in which CHIEF JUSTICE RABNER and JUSTICE SOLOMON join.

State of New Jersey,

Plaintiff-Appellant,

v.

L.H.,

Defendant-Respondent.

JUSTICE PATTERSON, concurring in part and dissenting in part.

I concur with the majority and the Appellate Division that the procedure used by police officers in connection with defendant's identification by M.H., one of the three sexual assault victims in this matter, did not comport with State v. Delgado, 188 N.J. 48, 63 (2006). Ante at ___ (slip op. at 39-43). I therefore agree with the majority and the Appellate Division that a remand is needed so that the trial court may decide whether the identification procedure entailed suggestiveness and, if necessary, impose an appropriate remedy. Ante at ___ (slip op. at 42-43).

I do not agree, however, that defendant's confession to two sexual assaults and one attempted sexual assault should be suppressed. Ante at ___ (slip op. at 31-39). The trial court denied defendant's motion to suppress after

it reviewed the videotape of defendant's confession and other evidence presented at the N.J.R.E. 104(c) hearing, made detailed factual findings, and concluded that the State had met its burden to prove beyond a reasonable doubt that the confession was voluntary. Neither the Appellate Division nor the majority afforded the trial court's findings the substantial deference to which they are entitled.

I concur with the majority that a portion of the interrogation that gave rise to this appeal crossed the line between proper and improper police tactics. The interrogating officers promised defendant that he would be provided counseling in the event that he confessed, and suggested -- notwithstanding the gravity of defendant's crimes -- that the officers would somehow ensure that the counseling would be afforded to defendant outside of a prison setting. Clearly, the officers should have refrained from offering any such assurances, which could deceive and coerce a suspect less intelligent and experienced than this defendant.

The videotape of the questioning, however, reveals defendant to be an intelligent, well-educated, self-confident veteran of the criminal justice system who was skeptical of the officers' reassuring comments and presented a carefully crafted narrative of his offenses that downplayed his culpability. As the trial court ruled and the videotape record confirms, the officers' statements

2

did not overbear defendant's will or coerce his confession. In my view, therefore, the trial court's finding that defendant's confession was voluntary was supported by sufficient credible evidence in the record.

Accordingly, I respectfully dissent from the majority's holding regarding defendant's motion to suppress his confession.

I.

A.

Well-settled jurisprudence sets the governing standard for this appeal. When a trial court assesses whether a videotaped confession was voluntary, it must hold an evidentiary hearing pursuant to N.J.R.E. 104(c), in which it imposes on the State the burden to prove voluntariness beyond a reasonable doubt and makes factual findings with respect to the pertinent factors. State v. Hreha, 217 N.J. 368, 383 (2014); State v. Knight, 183 N.J. 449, 462-63 (2005); State v. Galloway, 133 N.J. 631, 654 (1993); State v. Miller, 76 N.J. 392, 405 (1978). The court's assessment of the totality of the circumstances of a given case -- not its application of per se rules -- is at the core of the voluntariness determination. Hreha, 217 N.J. at 383. When the trial court's determination is appealed, its factual findings are entitled to substantial deference, even if those findings are premised exclusively on videotaped evidence. State v. S.S., 229 N.J. 360, 376-81 (2017); see also State v. A.M., 237 N.J. 384, 395-96 (2019);

3

State v. Hubbard, 222 N.J. 249, 269 (2015); State v. Locurto, 157 N.J. 463, 471 (1999).

B.

When the State seeks to admit a criminal defendant's confession, it has the burden to show not only that the defendant was informed of his or her rights under Miranda v. Arizona, 384 U.S. 436, 479 (1966), "but also that he has knowingly, voluntarily, and intelligently waived those rights, before any evidence acquired through the 'interrogation can be used against him,'" State v. Nyhammer, 197 N.J. 383, 400-01 (2009) (quoting Miranda, 384 U.S. at 479). Where, as here, the critical inquiry concerns the voluntariness of a confession, "the State shoulders the burden of proving beyond a reasonable doubt that a defendant's confession was actually volunteered and that the police did not overbear the will of the defendant." Hreha, 217 N.J. at 383 (citing Galloway, 133 N.J. at 654); see also Knight, 183 N.J. at 462.

To assess whether the State has met its burden, the trial court holds a pretrial hearing to "hear and determine the question of . . . admissibility out of the presence of the jury." N.J.R.E. 104(c).

When a trial court decides whether a confession is voluntary, it considers "the totality of the circumstances, including both the characteristics of the defendant and the nature of the interrogation." Hreha, 217 N.J. at 383 (quoting

4

Galloway, 133 N.J. at 654). Relevant factors include "the suspect's age, education and intelligence, advice concerning constitutional rights, length of detention, whether the questioning was repeated and prolonged in nature, and whether physical punishment and mental exhaustion were involved." Ibid. (quoting Galloway, 133 N.J. at 654). Courts also consider "whether the defendant has had previous encounters with law enforcement and the period of time between when Miranda rights were administered and when defendant confessed." Ibid. (citing State v. Timmendequas, 161 N.J. 515, 614 (1999)).

As the Court's jurisprudence in the separate but related context of Miranda waivers confirms, the totality-of-the-circumstances analysis rarely gives rise to bright-line rules invalidating a confession solely because of an interrogating officer's conduct. The Court noted in Nyhammer that "[o]nly in the most limited circumstances have we applied a per se rule to decide whether a defendant knowingly and voluntarily waived Miranda rights." 197 N.J. at 403. Instead, the Court relies on "'fact-based assessments' under a totality-of-the-circumstances approach" as "the proper way to decide whether a defendant voluntarily waived his rights." Ibid. (quoting State v. Dispoto, 189 N.J. 108, 124-25 (2007)).

## C.

As the Court has observed, in contrast to the use of physical coercion, the "use of a psychologically-oriented technique during questioning is not inherently coercive." Galloway, 133 N.J. at 654 (citing State v. Miller, 76 N.J. 392, 405 (1978)). The Court has acknowledged there exists "a natural reluctance on the part of a suspect to admit to the commission of a crime and furnish details." Miller, 76 N.J. at 403. "Efforts by an interrogating officer to dissipate . . . reluctance and persuade the person to talk are proper as long as the will of the suspect is not overborne." Ibid. The Court has held that "[t]he real issue is whether the person's decision to confess result[ed] from a change of mind rather than from an overbearing of the suspect's will." Galloway, 133 N.J. at 655 (citing Miller, 76 N.J. at 405). Thus, an assessment of police conduct is only part of the equation; the court must also determine, considering the totality of the circumstances, whether that conduct overbore the defendant's will. Hreha, 217 N.J. at 383; Galloway, 133 N.J. at 654-55. "Cases holding that police conduct had overborne the will of the defendant have typically required a showing of very substantial psychological pressure on the defendant." Galloway, 133 N.J. at 656.

The Appellate Division's decision in State v. Pillar illustrates circumstances in which an officer's promise is deemed significant enough to

overbear a suspect's will. 359 N.J. Super. 249 (App. Div. 2003). There, the defendant asked, during his custodial interrogation, whether he could tell the interrogating officer "something 'off-the-record.'" Id. at 262. The officer told the defendant he was willing to listen to an "off-the-record" statement. Ibid. The defendant, reassured that any statement he made would be "off-the-record," confessed to the sexual abuse of a child. Ibid. At a suppression hearing, the officer testified that he "was not sure what 'off-the-record' meant" and commented that he believed "there really is no such thing as off-the-record" once Miranda warnings have been administered. Ibid. The Appellate Division concluded that the officer's promise, "which defendant could reasonably believe meant that the statement would not be used against him, clearly had the likelihood of stripping defendant of his 'capacity for self-determination.'" Id. at 272-73 (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 225-26 (1973)).

In two cases, the Court has considered the totality of the circumstances and found that psychological tactics used by police in interrogating a suspect did not overbear his will. In Galloway, a police officer represented to the defendant that he needed to know how a child victim was injured so that doctors could properly treat the child; in fact, the officer's sole objective was to obtain the defendant's confession. 133 N.J. at 639, 653. Rejecting the

7

defendant's argument that his statement was involuntary, the Court concluded that even though the detective had used "a deliberate act of deception to secure a confession," id. at 653, he had not exerted "very substantial psychological pressure" or overborne the defendant's will, id. at 656. The Court relied on the defendant's comment, while waiting to hear whether the child victim would survive, that he was concerned about getting "blamed for this," as well as on the fact that defendant was asked to go to the police station to give a statement and had been repeatedly administered Miranda warnings. Id. at 657.

In Miller, an interrogating officer assured the suspect in a murder investigation that the perpetrator was not a person who should be punished, but instead merely needed medical treatment. 76 N.J. at 398. The officer assured the defendant that "he would do all he could to help [the] defendant but that [he] had to help himself first by talking about it." Ibid. "The officer said that [the] defendant was not being completely honest with him," and asked, "you killed this girl didn't you?" Ibid. The defendant disputed the officer's assertion, and the officer stated for a second time, "You've got to tell me the truth. I can't help you without the truth." Ibid. After the defendant's story regarding how the victim had been killed was shown to be incredible, the officer stated for a third time, "be truthful with yourself." Id. at 399. As the Court recounted the interrogation:

8

> [The] [d]efendant began to waver in his denial, saying, "This is going to kill my father." Seizing on the reference to his father, the officer said, "[i]f the truth is out, he will understand. That's the most important thing, not, not what has happened, Frank. The fact that you were truthful, you came forward and you said, look I have a problem. I didn't mean to do what I did. I have a problem. This is what's important, Frank." Defendant then confessed.
>
> [Ibid. (third alteration in original).]

As the majority notes, ante at ___ (slip op. at 35-37), the Court viewed the interrogator's psychological technique in Miller to be "mov[ing] into a shadowy area," and cautioned that the technique employed, "if carried to excess in time and persistence, can cross that intangible line and become improper." 76 N.J. at 404. It concluded, however, that as used in Miller, the technique did not cross such a line. Ibid. The Court noted that the previously convicted defendant "was in no way deluded or misled into believing that the [questioner] was acting in any capacity other than as an interrogating police officer in the investigation of a serious crime." Ibid. It also observed that the interrogation was less than an hour long, and that the distress manifested by the defendant after confessing was not abnormal in light of the "enormity" of the offense. Ibid.

Reviewing the defendant's habeas corpus petition, the United States Court of Appeals for the Third Circuit affirmed this Court's reasoning. Miller

v. Fenton, 796 F.2d 598, 613 (3d Cir. 1986). The Third Circuit expressed "little doubt that [the interrogating officer's] encouraging words . . . helped [the defendant] to reach his decision to unburden himself." Ibid. The court concluded, however, that the technique "did not produce psychological pressure strong enough to overbear the will of a mature, experienced man, who was suffering from no mental or physical illness and was interrogated for less than an hour at a police station close to his home." Ibid.

## II.

## A.

In this case, the trial judge did precisely what this Court's decisions direct that she should do. She held a two-day hearing pursuant to N.J.R.E. 104(c), during which she viewed L.H.'s videotaped confession and considered other testimonial and documentary evidence. As the transcript of that hearing reflects, the judge critically reviewed the evidence presented by the State.

The trial judge then made detailed factual findings which were recorded on eleven transcript pages and supported with citations to testimony from the hearing. Those factual findings -- many of which are omitted from the majority opinion -- fully support the trial court's determination of voluntariness.

10

The trial judge accepted the uncontroverted testimony of the lead investigator, Detective Lieutenant Krentz of the Bloomfield Police Department, that he administered Miranda warnings to defendant, who signed a Miranda card. The judge rejected defendant's argument that the confession should be suppressed because he was not informed until more than an hour into the interrogation about the sexual offenses that prompted his arrest and interrogation.

The trial judge made detailed findings as to the conditions of defendant's interrogation and his demeanor during that interrogation. She noted that defendant was offered food, water, and the use of bathroom facilities during the interrogation, and that the officers took a break during the inquiry to install a second recording disk. The judge found that "defendant, throughout the statement, appears to be calm and in no physical distress," and that "at times [he] could be seen laughing with the detectives as he tries to seemingly convince them of his lack of ill-intent towards the women he assaulted." The judge observed "a back and forth discussion" between defendant and the detectives, in which defendant was "intent on minimizing his conduct during the encounters" with the victims, "explaining often that he wasn't attempting to hurt anyone."

11

The trial judge acknowledged the detectives' psychological tactics, including "the promises made by the detectives of help[,] not jail." She stated that her evaluation of those tactics relied on "a weighing of the circumstance of pressure against the power of resistance of the person confessing."

In that context, the trial judge invoked several of the factors identified in this Court's decisions as relevant in a "totality of the circumstances" inquiry. See Hreha, 217 N.J. at 383; Knight, 183 N.J. at 462-63; Galloway, 133 N.J. at 654; Miller, 76 N.J. at 402-05. The judge noted defendant's maturity and college education. She cited defendant's status as a registered sex offender under Megan's Law, N.J.S.A. 2C:7-1 to -23, observing that "[h]e is no stranger to custodial interrogation or [to] this type of proceeding." The court found that the length of the interrogation -- three hours -- was not excessive "given the multiple victims and offenses covered during the interview." She found that those factors weighed in favor of a finding of voluntariness.

The trial judge substantially relied on defendant's own words, noting his tone and demeanor as he said those words. She inferred from defendant's comments during the videotaped interrogation that he understood the consequences of a confession. She found significant defendant's statement that in a prior case, he had made a statement to police that "caused him to end up in jail and cost him time and contact with his family." The judge noted that

12

despite defendant's observation that what he was saying could get him "into trouble," he chose to continue talking with the detectives. She commented that when defendant gave his version of the sexual assaults, he "attempt[ed] to distance himself with denials of the more violent aspects of the assault," thus confirming that he -- not his interrogators -- controlled the flow of information in their exchange. She cited defendant's question to the detectives whether the victims' accounts of the sexual assaults comported with his own.

Based on those factual findings, the trial court concluded that, under the totality of the circumstances, the detectives' tactics did not overbear defendant's will and defendant's confession was voluntary.

B.

I agree with the majority that in a portion of the interrogation, the interrogating officers traversed the line that separates proper psychological tactics from inappropriate assurances. Implying that defendant's prior experience with the criminal justice system would not be duplicated in this case, the officers suggested that the counseling defendant needed would be delivered in a setting other than jail, because "[n]obody gets rehabilitated in jail." See ante at ___ (slip op. at 33). They also told him that he was "not at all" going to jail that night. See ante at ___ (slip op. at 33). The officers went beyond a mere commitment to arrange mental health counseling and instead

13

tethered the prospect of such counseling to a suggestion that defendant would not be incarcerated -- at least not in the short term. Their statements were improper.

The Court has never held, however, that a police officer's inappropriate offer of counseling without incarceration gives rise to a per se rule barring the suspect's confession. See Nyhammer, 197 N.J. at 403 (noting the rarity of per se rules governing the question whether a Miranda waiver was knowing and voluntary). Instead, the inquiry is whether, considering the totality of the circumstances, defendant's will was overborne by the psychological tactics used in his interrogation. Galloway, 133 N.J. at 655; Miller, 76 N.J. at 405.

In my view, the trial court's finding that defendant's will was not overborne -- and that his confession was voluntary -- should be affirmed, because that finding was grounded in sufficient credible evidence in the record. See S.S., 229 N.J. at 374; Hreha, 217 N.J. at 382; Hubbard, 222 N.J. at 268; Locurto, 157 N.J. at 471.

The trial court properly considered defendant's maturity, intelligence, education, and prior experience with the criminal justice system as providing important context to his videotaped interrogation. Before he set foot in the Bloomfield Police Department interrogation room, defendant had experienced firsthand the consequences of admitting to police officers that he had

14

committed a sexual assault. As his interrogation revealed, defendant fully

understood the serious offenses for which he was investigated. He had every

reason to disbelieve the officers' suggestion that the outcome of the

investigation might be counseling rather than a custodial sentence.

In the videotaped record of his interrogation, defendant's skeptical

reaction to the officers' cajoling comments is on display. He invoked his prior

experience with law enforcement to challenge the officers' ingratiating

remarks. From start to finish, defendant's demeanor was consistent; he was at

all times alert, confident, and assertive.[1] His confession -- obtained without

---

[1] The majority finds it significant that defendant "was arrested at 2:30 a.m., transported to headquarters, and remained handcuffed in a room or confined in a cell for the next three hours," at which point he was interrogated. Ante at ___ (slip op. at 38). It notes that defendant stated that he was "tired as hell," but omits defendant's immediately preceding comment that he was "all right," as well as his refusal of the officers' offer of food and drink. To the extent that the majority infers that sleep deprivation is relevant to the question of voluntariness in the circumstances of this case, any such suggestion contravenes prior case law. See, e.g., W.B., 205 N.J. at 598-600 (holding that the defendant's confession was properly admitted although he waited in an interrogation room from 11:00 p.m. to sometime after 2:00 a.m. before being questioned, and did not confess until 3:40 a.m.); Timmendequas, 161 N.J. at 617-18 (holding that the defendant's forty-four hour interrogation, which began at 12:30 a.m., did not warrant suppression of his interrogation as the questioning was not "round the clock," the defendant was afforded breaks, and the defendant never indicated that he was too tired or hungry to continue); Galloway, 133 N.J. at 638-39, 657 (ruling that the defendant's confession was voluntary even though he was questioned early in the morning after a sleepless night, and noting that "[a]lthough defendant may not have slept that night, he did not appear tired").

15

repeated or prolonged questioning, intimidating conduct by the police, or physical abuse -- closely followed the administration of <u>Miranda</u> warnings.

Significantly, defendant did not simply affirm the officers' allegations, but maintained control of his narrative. Defendant supplied critical details about the time, location, and circumstances of each offense -- details that the officers did not provide him. He declined, however, to admit to an important aspect of two of the crimes: that each victim was abducted on the street and dragged to a secluded location, where each was sexually assaulted. Instead, he stressed to the officers that he treated those two victims with kindness and courtesy before, during, and after the sexual assaults. He suggested that once he initiated sexual contact, neither victim objected. By defendant's account, only the third victim -- whose screams and physical resistance foiled his attempt to kidnap and sexually assault her -- was unwilling to engage in sexual conduct with him.[2] Remarkably, defendant pressed the officers to verify that his version of the sexual assaults was consistent with the accounts of the victims.

---

[2] The majority premises its decision in part on what it characterizes as the officers' minimization of the seriousness of the crimes for which defendant was investigated. <u>See</u> <u>ante</u> at ___ (slip op. at 33). I do not share the majority's view that in the setting of this case, it was improper for the officers to establish a rapport with defendant by commending him for not injuring or killing the victims.

16

Defendant's demeanor and statements were not those of a suspect whose will was overborne. As in <u>Miller</u>, the interrogating police officers embarked on perilous ground by promising the defendant that candor would bring him the help that he needed. <u>See</u> <u>Miller</u>, 76 N.J. at 398-99, 404. In the end, however, defendant's decision to confess was clearly his own.

I consider the trial court's factual findings, based on the videotape of defendant's confession and the other evidence presented at the N.J.R.E. 104(c) hearing, to be based on sufficient credible evidence in the record. In my view, the court's determination of voluntariness and its admission of defendant's confession should be affirmed.

### III.

I would affirm in part and reverse in part the Appellate Division's determination. Accordingly, I respectfully concur in part with the majority's decision, and dissent in part from that decision.